# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT RAMOS, | CV F 07-00146 OWW SMS HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| JAMES YATES, | [Doc. 1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY AND BACKGROUND

Following jury trial in the Superior Court of the State of California, County of Tulare, Petitioner was convicted of one count of willful, premeditated and deliberate attempted murder and one count of issuing a criminal threat (Ca. Penal Code §§ 187/664, 422 ).[1] (CT 454-457.) In addition, it was found true that he personally used a firearm during the commission of each offense.

In a separate proceeding, Petitioner pled no contest to being an ex-felon in possession of a firearm (the same firearm used during the attempted murder and criminal threat case), and being under the influence of a controlled substance, a misdemeanor. (CT 456-457.)

Petitioner was sentenced to life with the possibility of parole, plus a consecutive 12 years

---

[1] All future references are to the California Penal Code unless otherwise indicated.

1

1  in state prison.  More specifically, Petitioner received a sentence of life with the possibility of
2  parole for the attempted murder plus ten years for the gun use, and two years on the criminal
3  threats charge.  (CT 454-457; Lodged Doc. C.)
4        Petitioner filed a timely notice of appeal in the California Court of Appeal, Fifth
5  Appellate District.  (Lodged Doc. C.)  On February 27, 2006, the Court of Appeal affirmed
6  Petitioner conviction and sentence.  (<u>Id</u>.)
7        On April 3, 2006, Petitioner filed a petition for review in the California Supreme Court.
8  (Lodged Doc. D.)  The petition was denied on June 14, 2006.  (Lodged Doc. E.)
9        Petitioner filed the instant petition for writ of habeas corpus on January 26, 2007.  (Court
10 Doc. 1.)
11       Respondent filed an answer to the petition on August 8, 2007.  (Court Doc. 9.)  Petitioner
12 did not file a traverse.

### STATEMENT OF FACTS

14       On January 10, 2003, Jaime Contreras was watching television with his five year old son,
15 at his home in Orosi, California.  (RT 303, 305.)  At approximately 10:00 a.m. that morning, he
16 heard loud pounding on his front screen door.  (RT 305.)  Contreras opened the front door and
17 observed Petitioner, who he did not know at the time.[2]  Petitioner had hit the screen door so hard
18 it opened and was bent.  (RT 306-307.)  Contreras noticed a red car parked in the front of his
19 house, and he observed Mark Sartuche inside the car (who he knew casually through family).
20 (RT 307-308.)
21       While Petitioner was standing outside of Contreras' front door, he repeatedly yelled
22 "Where the fuck is Jay?"[3]  (RT 309.)  Contreras told Petitioner that Jay did not live there.  (RT
23 310.)[4]  Petitioner became angrier and continued to yell, "Where the fuck is Jay?"  At that time,
24 Contreras' son, Joseph, who was standing next to him became scared.  (RT 310.)  As Contreras

---

[2] Contreras identified Petitioner at trial.  (RT 307.)

[3] Jay was Contreras younger brother as his full name is Julian Contreras.  (RT 309.)

[4] Jay had never lived with Contreras.  (RT 309.)

2

turned to grab his son, Petitioner opened the front door and entered Contreras' home. (RT 310.) Petitioner took two steps inside the home before Contreras grabbed him and threw him out. (RT 310-311.) Petitioner became even more angry and stated "What the fuck? You don't know who the fuck I am? I'm fucking Torro." (RT 311.) Contreras told him to leave. (RT 311.)

Contreras pushed Petitioner out of his home. (RT 311-312.) At this time, his son was holding onto his left leg. (RT 314.) As Contreras went to look at his son, he saw Petitioner pull out a gun from behind his back. (RT 314.) Petitioner pointed the gun at Contreras' son, stating, "Yeah, fuck, yeah, yeah." (RT 314.) Petitioner then pointed the gun at the son's head, stating, "Yeah, what now? Yeah, what now?" (RT 315.) He then pulled the gun up and pointed it at Contreras' heart and pulled the trigger. (RT 315.) The gun clicked but did not go off. (RT 315.) Petitioner attempted to shoot the gun again and as he was attempting to fix it, Contreras shoved Petitioner, grabbed his son, and ran inside his home and locked the door. (RT 315-317.) Petitioner was outside yelling, "Come out here, you fucking pussy, I'm going to fucking kill you. Just wait, I'm fucking Torro. I'm gonna fucking kill you. I'm gonna take you out." (Id.) Petitioner indicated that he would get Contreras in the street and kill him. (RT 323.) Contreras was terrified and he and his son laid on the floor of his residence. (RT 317.) He waited a while and then noticed that the car was gone. (RT 318.) Contreras had his son's grandfather pick him up and take him to another location. (RT 318.)

Later that day, Contreras heard a loud motor vehicle and observed a red Chevy truck parked in front of his residence. (RT 318.) He saw Gilbert Martinez (who Contreras was knew with from high school) and Petitioner in the truck. (RT 319-320.) Contreras saw that Petitioner had a black gun in his hands. He saw Petitioner cock the gun, put it behind his back, put on a jacket, and then exit the truck. (RT 320.) As Contreras remained quiet in his home, he heard Petitioner try to open the front door to the residence that was locked. (RT 321-322.) About a minute or so later, the truck left. (RT 322.)

Contreras called some friends in an attempt to discover the identity of "Torro." (RT 323.) Contreras called the police the next day to report the incident. (RT 323.) Contreras identified Petitioner from a photo lineup. (RT 325.)

3

On January 11, 2003, Deputy Sheriff Steve Sanchez received a call about a possible brandishing. (RT 284.) He responded to 12868 Avenue 413 in Orosi at approximately 9:45 p.m. and spoke with Jaime Contreras. (RT 283-284.) Contreras appeared to be afraid and concerned about the incident. (RT 284.) Contreras told Sanchez about the incident in a soft voice out of concern for his son who was present at the time. (RT 285.)

Mark Sartuche testified that he gave Petitioner a ride to Contreras' home on January 10, 2003, in his red Ford Festiva. (RT 430-432.) Sartuche meet up with Petitioner at a liquor store, and Petitioner asked for a ride to Contreras' home because he wanted to talk to one of the guys who lived there. (RT 435.) He did not see Petitioner with a firearm when he got out of the vehicle, and estimated Petitioner was out of the vehicle for about thirty seconds to a minute. (RT 439-, 444.) Sartuche stayed in the car while Petitioner talked to someone at the front door. (RT 435-436.) Sartuche testified that he did not hear anything outside while he waited nor did he hear any yelling. (RT 438.) Sartuche testified that he did not know anything about the incident until he was told by the Detectives. (RT 447.) Sartuche refused to identify the person that he drove to Contreras' home from a photo lineup because he did not want to be labeled as a "rat." (RT 442-443, 447.)

Gilbert Martinez testified that one day in January 2003, in the early morning hours, Petitioner arrived at his home and wanted to drink beer with him. (RT 455.) Petitioner drove Martinez's 1988 red pick up truck around Orosi and the two bought some beer. (RT 455-456.) After they bought the beer, they drove to Cutler and Petitioner indicated that he wanted to go to Contreras' home, where they drove to. (RT 456-457.) After they arrived there, Mr. Martinez stayed in the passenger seat of the truck and Petitioner got out. (RT 457.) Petitioner indicated that he just wanted to talk to Contreras. (RT 457.) Petitioner honked the horn, walked to the back of the truck toward the house, and yelled out. (RT 457.) No one answered the door. (RT 457-458.) Petitioner then walked back to the truck, honked the horn again, and after waiting a minute or so, drove off. (RT 458.) Martinez indicated that there was no incident at the Contreras' home. (RT 459.) He stated that Petitioner did not step into the yard, he only honked the horn. (RT 459.)

1    On January 14, 2003, Detective Mario Sandoval interviewed Contreras at his home while
2 his son was present. (RT 471.) Contreras provided a description of the gun indicating that it was
3 small, chrome, semiautomatic, .25 caliber, and had a clip. (RT 472.) Contreras identified
4 Petitioner from a photo lineup. (RT 473.)

5    Detective Sandoval also made contact with Mark Sartuche. (RT 474.) Sartuche was
6 hesitant to speak with Sandoval regarding the incident. (RT 474.) Although Sartuche indicated
7 that he gave Petitioner a ride to Contreras' home, he declined to identify him from a photo lineup
8 out of fear of being labeled a "rat." (RT 476.)

9    On January 17, 2003, Detective Sandoval interviewed Gilbert Martinez, who was also
10 hesitant to speak about the incident or identify Petitioner from the photo lineup. (RT 478, 480.)

11    In a related case, on January 29, 2003, at approximately 11:54 p.m., case number 104302,
12 Deputy Sheriff Richard Ramirez initiated a traffic stop on a truck that was traveling with no
13 headlight in the city of Cutler. (RT 266-267.) After making contact with the driver of the truck,
14 the Deputy noticed that Petitioner, who was the passenger in the vehicle, resembled an individual
15 on a "Be On The Lookout" poster. (RT 271.) Deputy Ramirez had another officer bring the
16 poster to the scene to confirm it was Petitioner. (Id.) Petitioner was arrested and placed in the
17 patrol vehicle. (RT 272.) Ramirez asked Petitioner for identification and he stated it was in the
18 truck under the passenger's seat. (RT 272-273.) Deputy Ramirez located the wallet under the
19 seat and also found a loaded firearm right next to the wallet. (RT 273-274.) When the Deputy
20 questioned Petitioner about the gun, he denied possession of it gun stating "that's not my .22."
21 (RT 276.) The Deputy had not mentioned that it was a .22. (RT 276.) Petitioner also stated that
22 it was chrome. (Id.) At the time of questioning, Petitioner could not have seen the gun. (Id.)
23 The clip in the gun contained six rounds. (RT 277.)

24    Sergeant Timothy Elliot of the Tulare County Sheriff's Department examined and test
25 fired the weapon found in the truck with Petitioner. (RT 293-294.) It was a .22 caliber
26 semiautomatic handgun, single-action type, with an inexpensive design. (RT 294.) Elliot
27 noticed the gun had a large crack in the slide, and because of this he chose not to use live
28 ammunition to test it. (RT 296.)

5

1     Elliot indicated that the gun had an unusual design in that it contained two manually
2 operated safeties, instead of the usual one safety. (RT 297.)  The bottom safety prevented the gun
3 from firing even if the trigger was pulled. (RT 298.)  With the bottom safety removed, the
4 trigger would pull and the internal part of the gun would seem to operate; however, there would
5 be an audible click, but when the hammer dropped on the firing pen, it would drop against the
6 number two safety. (RT 298.)  Therefore, in order for the gun to fire, the user would have to
7 remove both the trigger and the firing pen safety. (RT 298-299.)
8     Jaime Contreras identified the handgun taken from Petitioner as the weapon he used on
9 January 10, 2003. (RT 325.)

## DISCUSSION

### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B. Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

All of the claims raised in the petition and addressed herein were raised on direct appeal to the California Court of Appeal, Fifth Appellate District and California Supreme Court. (Lodged Docs. A, C, D, E.)  Because the California Supreme Court's opinion is summary in

nature, however, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

C.      Fourth Amendment Claim - Trial Court's Denial of Motion to Suppress

Petitioner contend that the trial court erred in denying his motion to suppress evidence in case no. VCF 105570.

A federal district court cannot grant habeas corpus relief on the ground that evidence was obtained by an unconstitutional search and seizure if the state court has provided the petitioner with a "full and fair opportunity to litigate" the Fourth Amendment issue. Stone v. Powell, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052 (1976); Woolery v. Arvan, 8 F.3d 1325, 1326 (9th Cir. 1993), *cert denied*, 511 U.S. 1057 (1994). The only inquiry this Court can make is whether petitioner had a fair opportunity to litigate his claim, not whether petitioner did litigate nor even whether the court correctly decided the claim. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996); see also Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990) (holding that because Cal. Penal Code § 1538.5 provides opportunity to challenge evidence, dismissal under Stone was necessary).

The policy behind the Stone Court's analysis is that the exclusionary rule is applied to stop future unconstitutional conduct of law enforcement. Stone, 428 U.S. at 492. However, excluding evidence that is not untrustworthy creates a windfall to the defendant at a substantial societal cost. See Stone, 428 U.S. at 489-90; Woolery, 8 F.3d at 1327-28. Thus, the Ninth Circuit has described the rationale for this rule by saying:

> The holding is grounded in the Court's conclusion that in cases where a petitioner's Fourth Amendment claim has been adequately litigated in state court, enforcing the exclusionary rule through writs of habeas corpus would not further

8

> the deterrent and educative purposes of the rule to an extent sufficient to counter
> the negative effect such a policy would have on the interests of judicial efficiency,
> comity and federalism.

Woolery, 8 F.3d at 1326; see also Stone , 428 U.S. at 493-494.

California provides defendants such an opportunity in the trial court through California Penal Code section 1538.5. In this instance, Petitioner brought a motion to dismiss the evidence against him in this case. In fact, on May 18, 2004, the trial court held a hearing on Petitioner's motion, which included live testimony from the arresting offer. (RT 228-255.) Therefore, it is undisputed that Petitioner had a full a fair opportunity to cross-examine the witness. (RT 235-249, 252-255.) In addition, Petitioner was given the opportunity to argue why the evidence should be suppressed. (RT 257-258.) Although the trial court ultimately denied the motion to suppress, it was done after providing Petitioner with a "full and fair opportunity to litigate" his Fourth Amendment issue. Stone, 428 U.S. at 494. Accordingly, Petitioner's claim is not cognizable.

D.   <u>Insufficient Evidence to Support Convictions for Attempted Murder and Criminal Threats</u>

Petitioner contends that there was insufficient evidence to support his convictions for attempted murder and criminal threats in case no VCF 105570.

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. Id. at 324, n.16.

Petitioner was convicted of attempted murder and criminal threats as defined in sections 187/664 and 422. Section 187, as defined to the jury in this case provides:

> Every person who attempts to murder another human being is guilty of a violation of Penal Code section 664 and 187.
> Murder is the unlawful killing of a human being with malice aforethought.
> In order to prove attempted murder, each of the following elements must be proved;
> 1. A direct but ineffectual act was done by one person towards killing another human being; and
> 2. The person committing the act harbored express malice aforethought,

namely, a specific intent to kill unlawfully another human being.

(CT 217.) Malice is defined as follows:

> [Malice is express when there is manifested an intention unlawfully to kill a human being.]
> [When it is shown that a attempted killing resulted from the intentional doing of an act with express malice, no other mental state need be shown to establish the mental state of malice aforethought.
> The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.
> The word "aforethought" does not imply deliberation or the lapse of considerable time.  It only means that the required mental state must precede rather than follow the act.

(CT 216.)

Section 422, as defined to the jury in this case provides:

> Every person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which threat, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, is guilty of a violation of Penal Code section 422, a crime.

(CT 220.)

Contrary to Petitioner's contention, there was sufficient evidence from which a rational trier of fact could find beyond a reasonable doubt that Petitioner was guilty of attempted murder and criminal threats.

Petitioner initially contends that the testimony by the victim alone was insufficient to support his conviction because it was not corroborated by the other witnesses testimony. Petitioner's argument is without merit. Victim, Jaime Contreras, testified that on January 10, 2003, Petitioner pounded on his front door and was yelling for his brother, Jay. (RT 306-307.) When Contreras opened the front door and informed him that Jay did not live there, Petitioner became angry and continued to yell. (RT 308-210.) Petitioner opened the front door and entered the home. (RT 310.) Contreras grabbed Petitioner and threw him out, which caused Petitioner to become even more angry. (RT 310-311.) Petitioner then pulled a gun from behind his back and aimed it at Contreras' son who was holding onto his father's leg. (RT 314.) Petitioner continued to yell and then subsequently pointed the gun at Contreras' heart and fired it. (RT 314-315.)

10

Luckily, the gun did not fire. As Petitioner continued to fire the gun and attempted to fix it, Contreras shoved him and ran into his home and took cover with his son behind the couch. (RT 315-317.) At this time, Petitioner continued to yell and threaten that he was going to kill Contreras. (RT 315-317, 323.) Contreras' testimony was not physically impossible or inherently improbable, and such testimony alone was sufficient to support Petitioner's convictions for attempted murder and criminal threats. Under the Jackson standard, the testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. See United States v. Arrington, 719 F.2d 701, 705 (4th Cir. 1983) (the uncorroborated testimony of one witness may be sufficient to sustain a guilty verdict); see also People v. Panah, 35 Cal.4th 395 (2006) ("The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable.") (internal quotation marks and citation omitted).[5]

However, in addition to Contreras' testimony, both Mark Sarchute and Gilbert Martinez testified that they drove Petitioner, on two separate occasions, to Jaime Contreras' home. (RT 430-432, 435, 456-457.) Petitioner indicated that he needed to speak with someone at the home. (RT 435, 457.) Although these two witnesses were not able to corroborate the victim's testimony regarding the incident, this does not render a finding of guilt based on the victim's testimony insufficient. Moreover, Petitioner was found in possession of a firearm that Contreras identified as used on day of the incident. (RT 272-274, 276, 325.)

Petitioner further contends that his conviction should be reduced to attempted manslaughter because he was acting under the "influence of strong emotion caused by [Jaime's] repeated denials that his brother was not in the house" and because Jaime pushed him out of the house. As stated by the Court of Appeal, provocation is judged by an objective standard; i.e. the

---

[5] In fact, the jury was instructed with CALJIC No. 2.27 which states:

> You should give the testimony of a single witness whatever weight you think it deserves. Testimony concerning any fact by one witness, is sufficient for the proof of that fact. You should carefully review all the evidence upon which the proof of that fact depends.

(CT 204.)

conduct must be sufficiently provocative that it would cause an average person to be so inflamed that he or she would lose reason and judgment. People v. Steele, 27 Cal.4th 1230, 1253 (2002). Here, Petitioner has not and cannot meet this standard. A reasonable person in Petitioner's situation would not lose reason and judgment and react with the use of deadly force merely out of the belief that Contreras was lying about his brother's presence at the home and was pushed out of the victim's home. The evidence simply does not support a finding that Petitioner was objectively provoked into shooting Contreras. The jury properly weighed any significance of Petitioner's provocation and rejected such argument, and this Court cannot reweigh such evidence.[6] See Jackson v. Virginia, 443 U.S. at 319 (It is the province of the jury to "resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.").

Accordingly, based on the foregoing evidence, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

E.      Sentencing Errors/Imposition of Consecutive Sentences

---

[6] Indeed, the jury was instructed as follows:

T]o reduce an unlawful attempted killing from attempted murder to attempted manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion.
The heat of passion which will reduce a attempted homicide to attempted manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up [his] [her] own standard of conduct and to justify or excuse [himself] [herself] because [his] [her] passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted [him] [her] were such as also would have aroused the passion of the ordinarily reasonable person faced with the same situation. Legally adequate provocation may occur in a short, or over a considerable, period of time.
The question to be answered is whether or not, at the time of the attempted killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than from judgment.
If there was provocation, whether of short or long duration, but of a nature not normally sufficient to arouse passion, or if sufficient time elapsed between the provocation and the fatal blow for passion to subside and reason to return, and if an unlawful attempted killing of a human being followed the provocation and had all the elements of attempted murder, as I have defined it, the mere fact of slight or remote provocation will not reduce the offense to manslaughter.

(CT 226; CALJIC No. 8.42.)

1.    Imposition of Consecutive Sentence on Count 2

Petitioner contends that the trial court erred by sentencing him consecutively on count 2, in case number 105570, because the facts demonstrated an indivisible course of conduct, warranting a stay pursuant to section 654.

As Respondent correctly argues, this claim is not cognizable as it arises purely under state law. "[A]lleged errors in the application of state law are not cognizable in federal habeas corpus" proceedings. Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997). A determination of state law by a state appellate court is binding in a federal habeas action, Hicks v. Feiock, 485 U.S. 624, 629 (1988), unless the interpretation is an "obvious subterfuge to evade consideration of a federal issue." Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11 (1975); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (federal habeas court must respect a state court's application of its own law and must not engage in *de novo* review). A federal court has no basis for disputing a state's interpretation of its own law. Clemons v. Mississippi, 494 U.S. 738, 739-40 (1990).

Here, in rejecting Petitioner's claim on direct appeal, the Fifth District Court of Appeal held:

> The court imposed a sentence of two years on count two, criminal threat. In count one the court imposed a sentence of life with the possibility of parole for the attempted murder plus 10 years for the gun use. The court ordered count one to run consecutive to count two.
> [Petitioner] asserts the trial court erred in running count one consecutive to count two because the facts demonstrate an indivisible course of conduct precluding consecutive terms. [Petitioner] argues that he had a single intent and objective and that was to convey his intent to kill Jaime. He contends that he did not have an intent to kill during one time frame and an intent to threaten or frighten during another time period.
> '[Penal Code] [s]ection 654 does not preclude multiple convictions but only multiple punishments for a single act or indivisible course of conduct. [Citation.]' [Citation.] 'The proscription against double jeopardy punishment in section 654 is applicable where there is a course of conduct which ... comprises an indivisible transaction punishable under more than one statute.... The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one.' [Citation.] 'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. [Citation.]' (*People v. Coleman* (1989) 48 Cal.3d 11, 162.)
> Although the crimes committed here were close in time, the trial court could properly find that [Petitioner] formed a separate intent and objective for each offense. When [Petitioner] pulled the trigger of the gun as it was pointed at Jaime's heart, his intent was to kill. When that attempt was unsuccessful, Jaime shoved [Petitioner] away, slammed the door, and took cover beneath the couch with his son. Not only did

>   this interval in time give [Petitioner] an opportunity to reflect, but his intention then shifted to frightening Jaime by threatening to kill him.  The facts supported the trial court's determination that resulted in the imposition of consecutive sentences.

(Lodged Document C, Opinion, at 9-10.)

Because this claim and the Court of Appeal's analysis were based entirely upon an interpretation and application of California law, the claim is not cognizable via § 2254.  In any event, Petitioner has failed to demonstrate that the state court's adjudication of this claim was contrary to or an unreasonable application of clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).

  2. <u>Imposition of Consecutive Sentences on Counts 1 and 2</u>

In a separate claim, Petitioner contends that the trial court erred by sentencing him consecutively on counts 1 and 2 in case number 105570 because there was no jury determination that he acted with either a single or multiple objective, thereby violating his Sixth and Fourteenth Amendment rights.  The Court does not find Petitioner's argument persuasive.

On March 17, 2008, the United States Supreme Court granted a petition for a certiorari to address the question "Whether the Sixth Amendment, as construed in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 127 L.Ed.2d 435 (2000), and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), requires that facts (other than prior convictions) necessary to imposing consecutive sentences be found by the jury or admitted by the defendant." See <u>Oregon v. Ice</u>, 128 S.Ct. 1657, 170 L.Ed.2d 353 (2008).  The issue is still pending in that Court, and oral argument is set for October xx, 2008.

However, turning to existing law, following remand after the decision in <u>Cunningham v. California</u>, 549 U.S. 270, 127 S.Ct. 856 (2007), the California Supreme Court re-issued its opinion in <u>Black</u>, and with respect to consecutive sentences stated that: "The high court's decision in Cunningham does not call into question the conclusion we previously reached regarding consecutive sentences," which held that "imposition of [consecutive sentences] does not implicate a defendant's Sixth Amendment rights."  <u>People v. Black</u>, 41 Cal.4th 799, 821-823 (2007).  In addition, as stated by Respondent, at least six other state supreme courts have also found that the <u>Apprendi</u> line of cases does no impact their consecutive sentencing laws.  State v.

14

Kahapea, 141 P.3d 440, 452 (Haw. 2006); State v. Cubias, 120 P.3d 929, 932-933 (Wash. 2005); State v. Higgins, 821 A.2d 964, 975-976 (N.H. 2003); State v. Bramlett, 41 P.3d 796, 797-798 (Kan. 2002); Hall v. State, 823 So. 2d 757, 764 (Fla. 2002); People v. Wagener, 752 N.E.2d 430, 440-443 (Ill. 2001).

The Supreme Court's holdings in Apprendi, and its progeny, did not address a defendant's jury trial right as applied to the judge's authority to impose consecutive sentences. As a consequence, there is currently no clearly established Supreme Court authority finding that a defendant is entitled to a jury trial based on facts proved beyond a reasonable doubt prior to imposition of a consecutive sentence, and the state courts' rejection of this claim can not be considered to be contrary to or an unreasonable application of clearly established Supreme Court law.

F.   Trial Court Err in Denial of Motion to Vacate Plea in Case No. 104032

Petitioner contends the trial court erred by denying his motion to vacate his plea in case number 104302 because it was entered while he was under duress.

A plea of guilty is constitutionally valid only to the extent it is "voluntary" and "intelligent." Brady v. United States, 397 U.S. 742, 748 (1970). In determining whether a plea was knowingly, voluntarily and intelligently made, a reviewing court must accord a strong presumption of verity to the declarations made by a defendant in open court. Blackledge v. Allison, 431 U.S. 63, 74 (1977). "[R]epresentations [made by] the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." Id. at 73-74. Furthermore, Petitioner's allegations of a coerced plea must be specific and point to a real possibility of a constitutional violation. "[S]ubsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." Id. at 74, *citing* Machibroda v. United States, 368 U.S. 487, 495-496 (1962); Price v. Johnston, 334 U.S. 266, 286-287 (1948).

The Fifth District Court of Appeal correctly summarized the record providing the details surrounding Petitioner's no contest plea in case number 104032, and this Court hereby adopts

that analysis. Specifically, the Court of Appeal stated, in relevant part:

> In Tulare County Superior Court case number 104302, [Petitioner] was charged with sale of a controlled substance, possession of a firearm by a felon, and being under the influence of a controlled substance. This case trailed his jury trial in the attempted murder case.
>
> After the jury returned their guilty verdicts in the attempted murder and criminal threat case, the court had a short discussion regarding a strike alleged against [Petitioner] that had been bifurcated from the underlying counts.[footnote omitted]. [Petitioner] asked how things were going to proceed on his other case (No. 104302) that was trailing. His attorney on that case said that he and the deputy district attorney were trying to resolve the case by way of a plea. Because this case was trailing, the court said it would set the trial for the following week. [Petitioner] asked if he could get a postponement on No. 104302 until his appeal was resolved in the attempted murder case. The court said that would take over a year. [Petitioner] then asked if the determination of No. 104302 could wait until after he filed a motion for new trial in the attempted murder case. The court said the trial should still proceed on No. 104302. [Petitioner] then posed a series of questions regarding how the two cases would affect one another for sentencing and if the verdict in the attempted murder case could be used against him in No. 104302. [Petitioner] asked other pertinent questions regarding the strike that the court was still considering in the attempted murder case and how that would affect No. 104302, and how a plea in No. 104302 would affect that strike.
>
> [Petitioner] then said he was having a hard time trying to think right now. He was asked if he wanted to think about it over the weekend and give an answer on Monday. [Petitioner] asked the district attorney to put the proposed plea in writing and explain it a little bit more. [Petitioner] queried whether he would receive a continuance so he could prepare for his trial in No. 104302. The court questioned [Petitioner] why he needed a continuance. It was discussed that the judge who previously denied a continuance in the attempted murder case had not ruled on [Petitioner's] request for a continuance in No. 104302. The court instructed [Petitioner] to put in writing why he needed a continuance and the court would address it on Monday morning. The court told [Petitioner] that there was always the possibility the continuance would be denied.
>
> Next, [Petitioner] inquired whether the driver of the car where the gun was found would have to re-invoke his Fifth Amendment right not to testify in case No. 104302 since he had invoked it in the attempted murder case. The court said he could invoke that right again, but it is a completely separate proceeding.
>
> [Petitioner] informed the court he was not going to accept the plea and asked the court if it would rule on the continuance motion at that time. The court again instructed [Petitioner] to put his continuance motion in writing and the court would rule on it on Monday. The court told [Petitioner] that if it denied the motion, the trial would start on Tuesday.
>
> The following Monday the court announced that the proposed plea was for [Petitioner] to enter pleas to being an ex-felon in possession of a firearm and to the misdemeanor charge of being under the influence. In return the People would dismiss the drug possession charge and would strike the alleged strike. The court would also sentence [Petitioner] to the mitigated term on the ex-felon in possession charge. In addition, the court stated it would postpone sentencing until resolution of the attempted murder case if that is what [Petitioner] wanted.
>
> The court explained the rights [Petitioner] was giving up and asked [Petitioner] if he would give up those rights. [Petitioner] responded he would give up the rights but he was nervous about the strike issue. The court explained that the strike was being dropped from this case (No. 104302) and was still under consideration in the attempted murder case. [Petitioner] then pleaded no contest.
>
> Defendant filed a motion to withdraw his plea, claiming he was under duress at the time he entered the plea. He claimed he was under duress because he had just

> been convicted in the other case, his counsel was insistent that he enter the plea, the two-week time schedule for going to trial was not sufficient for him to prepare, and he did not get any support from the trial court.
> 
> The court reviewed the plea transcript and also recalled what transpired at the time the plea was taken. The court recalled that it had attempted to give [Petitioner] as much time as he needed to determine if he wanted to enter the plea. The court also recalled that [Petitioner's] main concern was that he did not want to have his plea result in a strike and that the court had assured him that his plea did not involve a strike. The court did not find good cause for [Petitioner's] motion to withdraw the plea.
> 
> ..................................................................................................................
> 
> [Petitioner] claims he was under duress when he entered his plea, having been convicted only three days earlier in the other case. Since he represented himself in those proceedings, he argues it would be understandable for him to be overwhelmed at the prospect of going to trial again within two weeks. He argues that the trial court erred in denying his motion to withdraw his plea. [footnote omitted.]
> 
> We find nothing in the record, other than [Petitioner's] declaration, to show that he was under duress at the time he entered his plea. Immediately following the guilty verdicts in the attempted murder case, [Petitioner] began asking questions about No. 104302. He also asked pertinent and probing questions regarding the interplay between these two cases. He was given the weekend to file a motion for continuance, but instead he opted for accepting the plea bargain. At the time of the plea bargain he gave absolutely no indication that he was being pressured or was under duress of any kind; in fact, he again asked pertinent questions regarding his plea and how it would affect his other case. The record reflects that [Petitioner] was thinking clearly. The trial court recalled what occurred at the time [Petitioner] entered the plea and did not find any evidence that [Petitioner] was acting under duress. On this state of the record, we cannot say the trial court abused its discretion when it denied [Petitioner's] motion to withdraw his guilty plea.

(Lodged Doc. C, Opinion, at 10-14.)

Little more need be said about Petitioner's claim beyond that stated by the Court of Appeal. Prior to taking Petitioner's plea, the trial court specifically advised him that by entering a plea he would be giving up the right to a trial, the right to subpoena witnesses, the right to cross-examine and confront witnesses, as well as the right to testify at trial if he chose to do so. (RT 612-613.) The trial court found that Petitioner knowingly, intelligently, and voluntarily waived those rights and fully understood the consequences of his plea. (RT 615.) Petitioner's subsequent conclusory allegation that he was under duress is not credible in light of his solemn declarations in open court. See Blackledge v. Allen, 431 U.S. at 73-74. Simply stated, because there is no showing of duress that deprived Petitioner of his exercise of free will in entering his plea, the trial court did not abuse its discretion in denying his request to withdraw the plea. As a consequence, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and,

2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **July 22, 2008**                              /s/ Sandra M. Snyder
                                                UNITED STATES MAGISTRATE JUDGE